IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**LYNN E. HALSTEAD,**                            Case No. 3:16 CV 2685

      Plaintiff,                            Judge James G. Carr

      v.                                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                            REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Lynn E. Halstead ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 3, 2016). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in May 2013, alleging a disability onset date of April 22, 2012. (Tr. 177-91). His claims were denied initially and upon reconsideration. (Tr. 141, 145, 152, 159). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 164). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 5, 2015. (Tr. 33-82). On August 13, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-27). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on November 3, 2016. (Doc. 1).

### FACTUAL BACKGROUND

Personal Background & Testimony

Plaintiff was born in October 1968, making him 43 years old at his alleged onset date, and 46 at the time of his hearing. *See* Tr. 38. He lived in an apartment with two of his children, one of them an adult. (Tr. 39). Plaintiff had previously worked primarily as a truck driver. (Tr. 40-43).

Plaintiff testified he stopped working in April 2012, after a work-related driving accident; he was not injured in the accident. (Tr. 46-47). He was subsequently fired after an investigation near the end of 2012. (Tr. 47).

Plaintiff testified his arm tremors began in October or November 2012, and included a tingly feeling "up and down" his arm. *Id.* He thought he had a stroke, but "didn't have money to pay [his] regular doctor at the time". *Id.* He testified that when he takes his morning dose of medication at 10:00 a.m., he is "pretty much wiped out", that is "[j]ust tired, fatigued, don't want to do anything, no energy." (Tr. 49). Diarrhea was also a medication side effect. (Tr. 50). His morning medications are Depakote, Levetiracetam (Keppra), and Famotidine (Pepcid). *Id.* Plaintiff also takes a muscle relaxant as needed. (Tr. 50-51). He usually takes an afternoon nap. (Tr. 49). Plaintiff testified he told Dr. Anouti about this tiredness and fatigue, and "he said that's common." (Tr. 50).

When asked what kept him from working, Plaintiff testified "I mean, basically, what keeps me from working is, you know, the medicines that they've got me on." (Tr. 48). Plaintiff testified

that with the benefits of his medications, but without the side effects (fatigue and diarrhea), he did not see why he would be not able to work. (Tr. 55-56).

Plaintiff was not having seizures at the time of the hearing, which he attributed to his medications working. (Tr. 51). Without the medication, he would feel tingling up and down his arm from his elbow to fingertips constantly. (Tr. 51-52). He would also have involuntary movements of his hand. (Tr. 52). He could, however, still use his hand for lifting, carrying, and washing dishes, though his "writing wasn't the greatest." (Tr. 52-53).

The tremors and jerking initially started in Plaintiff's left arm, but "as time[] went on, the right's become the one with the most problem." (Tr. 60). The arm jerking used to be worse but now that he took medication, he does not "really notice the movement unless it's a real big one." *Id.* He testified to having a seizure while visiting a physician's office in conjunction with his disability case. (Tr. 61-62) ("And all of a sudden it would go up here and then it started flapping and by [t]he time that guy went ahead and came back, my arm was in full seizure and I told him I'm having a seizure[.]"). This lasted about five to ten minutes, but such incidents did not happen often, and "[t]o be honest, that's the worst one [he'd] ever had." (Tr. 62).

Around the same time as the tremors starting, Plaintiff began having increasing anger issues. (Tr. 53-54). He testified Dr. Anouti told him that was typical because of the damage to his right frontal lobe. (Tr. 54). The Depakote helps with his anger. *Id.*

Plaintiff testified he drove two to three hours a day doing errands. (Tr. 39). He later clarified that this is throughout the course of the day, in shorter increments. (Tr. 63). He also testified that he does not like to drive more than he has to because he "do[esn't] want to put other people at risk". (Tr. 57). He sometimes zones out for three to four seconds at a time, six to eight times per

day. (Tr. 57-59). This happened while driving, and at other times. (Tr. 57). Plaintiff's children

noticed it "[a] couple times a week." (Tr. 59).

Plaintiff's typical day involved doing "a couple chores for [his] mom, to the mailbox and

store" and "the rest of the day [he] spend[s] . . . laying on the couch taking a nap after [his]

medicine] and then [he] just sit[s] out there on the porch". (Tr. 64). He also washed dishes and

watched television. (Tr. 64-65).

Plaintiff testified that he could not sleep without sleeping pills, but with them, he slept

seven to eight hours. (Tr. 64).

During the VE's testimony, the ALJ asked Plaintiff if he had fallen asleep, noting

"[b]ecause you were leaning back with your eyes closed and you talked about fatigue so I thought

I would ask", and Plaintiff said he had not. (Tr. 74).

Relevant Medical Evidence[1]

In December 2012, Plaintiff saw Michael Scherer, D.O., to establish care. (Tr. 361). He

reported chest pain, musculoskeletal discomfort and spasms, and left-knee discomfort. *Id.* He was

taking Paxil, Ativan, and Neurontin. (Tr. 358). A physical examination, and follow-up cardiac

testing were mostly unremarkable. (Tr. 273-74, 287, 354, 362-63); *see also* Tr. 354 ("stress test

12-19 unremarkable except for pauses (little mention of this)").

Plaintiff returned to Dr. Scherer in January 2013 complaining of an irregular heartbeat, and

a hand tremor. (Tr. 352). Plaintiff's heart examination was normal, and Dr. Scherer did not observe

the hand tremor. (Tr. 354). Dr. Scherer prescribed Lipitor for high cholesterol, and advised Plaintiff

---

1. Plaintiff challenges only the ALJ's consideration of his treating neurologist's opinion and the ALJ's consideration of his statements regarding fatigue and drowsiness as medication side effects. *See* Doc. 14. Thus, the undersigned only summarizes the relevant records.

4

to "consult cardiology re arrhythmia as he drives truck [and] will need to go to occ[upational] health re CDL". (Tr. 355).

In February 2013, Plaintiff reported gastrointestinal symptoms, continued numbness in his left arm and hand, and weakness in his left arm. (Tr. 340, 344). On examination, Dr. Scherer noted Plaintiff's left grip was weaker. (Tr. 346). Dr. Scherer stopped Plaintiff's Ativan and Lipitor, and decreased his Ambien dosage. (Tr. 347). He ordered a CT of the abdomen/pelvis, and a brain MRI (Tr. 340), which were normal (Tr. 289-90).

Plaintiff continued to report neurological symptoms in March, including numbness in both hands, memory loss, and restless sleep. (Tr. 331). Plaintiff's physical examination was largely normal, and Dr. Scherer referred him to a neurologist. (Tr. 332-34).

In April 2013, Plaintiff saw neurologist Ahmad Anouti, M.D. (Tr. 375-76). He reported an incident when his left arm went cold and numb, and his leg was shaking for an hour, accompanied by dizziness. (Tr. 376). Two weeks later, he had a similar incident where his left forearm and hand were cold and numb. *Id.* Additionally, he reported "[h]is left side shake[s] at times". *Id.* He was "forgetful intermittently, but no major problems in ADLs". *Id.* He reported forgetting small things, like turning the oven off, or leaving an item somewhere. (Tr. 534). Dr. Anouti ordered an EEG, and a cervical spine MRI to look for cord compression, and an EMG of the left upper extremity. (Tr. 376).

The MRI showed no evidence of cervical nerve root impingement, and a small disc protrusion at C6-7 with mild right lateral recess stenosis and moderate right foraminal stenosis with exiting C7 root. (Tr. 377-78). The EEG was abnormal "due to the presence of occasional sharp wave activity originating from the right frontal area during the hyperventilation phase." (Tr. 379). The physician noted that this might be indicative of epilepsy, but "there were no clinical

seizures observed during this recording". *Id.* The EMG of Plaintiff's left arm was normal. (Tr. 374). Dr. Anouti started Plaintiff on Keppra. (Tr. 371).

Also in April, Plaintiff returned to Dr. Scherer. (Tr. 319-26). Dr. Scherer noted Plaintiff's musculoskeletal examination was "[a]bnormal", but provided no detail. (Tr. 324).

In May, Plaintiff returned to Dr. Anouti. (Tr. 371-72). Plaintiff reported seizure activity as a child, but none since childhood. (Tr. 371). On examination, Dr. Anouti noted Plaintiff's left forearm was cold and exhibited twitching and fasciculations. (Tr. 372). Dr. Anouti noted he had previously prescribed Keppra, and Plaintiff had "no side effects" and "[n]o changes so far". *Id.* Dr. Anouti increased the Keppra dosage, noted that because Plaintiff was taking seizure medication, he could not drive a tractor-trailer. *Id.*

In June, Plaintiff reported "issues with sleepiness and poor memory" to Dr. Scherer. (Tr. 388). Plaintiff's physical examination was normal; Dr. Scherer advised him to return in three months, and continue to follow up with Dr. Anouti. (Tr. 389-91).

In August 2013, Plaintiff continued to report to Dr. Anouti that his left forearm was cold, and twitching. (Tr. 399). He also reported being "spacy" while driving, as well as irritable and angry. *Id.* On examination, Plaintiff's left hand was cold. *Id.* Dr. Anouti noted "he has some medication side effects making him short tempered or spacy". (Tr. 400). Dr. Anouti noted that due to the spaciness, Plaintiff should not drive, and he ordered a repeat EEG. *Id.* That EEG was "[m]ildly abnormal . . . because of right predominantly frontal dysrhythmic activity with single sharp waves and slow wave activity related to focal cerebral dysfunction that could be ischemic, congenital or of other etiologies." (Tr. 528). No major epileptiform discharges were seen. *Id.*

In September, Dr. Scherer noted Plaintiff was tolerating his medication (Tr. 470) and his physical examination was normal (Tr. 471).

6

In November 2013, Plaintiff was "about the same", with symptoms of his left arm becoming cold, some tingling in his left shoulder area, but no weakness. (Tr. 524). He had occasional jerking. *Id.* He was irritable and anxious, and his wife reported he was forgetful. *Id.*

Plaintiff saw Dr. Scherer in December 2013 and February 2014. (Tr. 473-78). His physical examinations were normal. (Tr. 475, 478). In February, Dr. Scherer noted Plaintiff was "on Depakote 500mg bid and tolerating". (Tr. 477).

In March 2014, Plaintiff returned to Dr. Anouti. (Tr. 519, 522-23). He had "some tremors" and a "few left arm jerks at night". (Tr. 522). On examination, Plaintiff had decreased sensation in his left arm and leg, and his left hand was colder than the right. *Id.* Dr. Anouti noted Plaintiff's recent and remote memory were intact. *Id.* Dr. Anouti noted Plaintiff was not permitted to drive a truck yet and that he was "[d]isabled at this stage." (Tr. 523).

Also in March 2014, Plaintiff underwent neurobehavioral testing with Marc Dielman, Ph.D., on referral from Dr. Anouti. (Tr. 406-20). Dr. Dielman concluded that "[b]asically, [Plaintiff] [was] functioning in the borderline range of cognitive abilities with achievement commensurate to his cognitive abilities." (Tr. 407). He had "significant memory and attentional difficulties and [was] mildly anxious and depressed." *Id.* Dr. Dielman stated if Plaintiff would be "able to return to any kind of even part-time work, he might pursue help through BVR (Bureau of Vocational Rehabilitation)." *Id.*

Plaintiff underwent another repeat EEG in April 2014, which showed abnormal results similar to the prior two. (Tr. 525-26).

Plaintiff saw Dr. Scherer in June 2014, with an essentially normal physical examination. (Tr. 480-82). That same month, Dr. Anouti noted Plaintiff was "[b]etter in general" with "some stress" due to a divorce. (Tr. 520). He was taking Keppra, Gabapentin, and Depakote, and had

"[s]ome sedation, [but] no other side effects." *Id.* His memory was improved, and he was driving short distances. *Id.* He reported he "sleeps after taking meds" and had some memory loss. (Tr. 519). Plaintiff had similar physical findings to his prior visit and Dr. Anouti noted Plaintiff could "drive at this stage to complete his chores." *Id.*

In August 2014, Plaintiff reported to Dr. Scherer that he was experiencing tremors on the right side. (Tr. 485). He also reported the tremor in his hands was worse over the prior four to five days, and that it was worse with stress (due to his divorce, and pending social security hearing). (Tr. 487). His physical examination was essentially normal, and Dr. Scherer added medication for diabetes. (Tr. 488-90). Plaintiff also saw Dr. Anouti that month, who noted again Plaintiff could drive "to complete his chores". (Tr. 517). Plaintiff reported that "[h]e sleeps after taking meds" and he had "one spell involving [his] right arm". (Tr. 518). Dr. Anouti assessed "[f]ocal seizures with left sided twitching and tingling and cold feeling, stable on Keppra and Depakote" and "[m]emory loss partly related to frontal lobe dysfunction from seizures." *Id.*

In September and November, Plaintiff saw Dr. Scherer to follow up on his diabetes. (Tr. 490-99). Physical examinations were normal. (Tr. 493-94, 499). In November, Dr. Scherer noted "tolerating meds, feeling better". (Tr. 498).

Later in November, Plaintiff returned to Dr. Anouti. (Tr. 507, 512). He was "[a]bout the same", but "now the right hand shakes, sometimes shifts to the left." (Tr. 512). His memory was better, and he was driving. *Id.* Dr. Anouti noted Plaintiff was anxious and depressed with "minor slowing". *Id.* Dr. Anouti observed Plaintiff's right hand and arm tremor and also noted "the left arm twitch and fasciculation has improved." (Tr. 509).

In February 2015, Plaintiff returned to Dr. Anouti. (Tr. 504-07). He was "[ab]out the same", reporting twitching in his left and right arm. (Tr. 506). Dr. Anounti reported Plaintiff "is

on Keppra, Depakote, Neurontin, no major side effects" and that he was independent in his activities of daily living. *Id.* His physical examination findings were essentially the same. (Tr. 506-07). Dr. Anouti continued Plaintiff's medications, noted he could "drive at this stage to complete his chores" and could "work parttime [sic], no work at heights or with heavy machines or under extremes of temperature or stressful environment." (Tr. 507).

Plaintiff also saw Dr. Scherer in February for a diabetes check-up. (Tr. 535-40). Dr. Scherer noted Plaintiff was "overall better, tolerating meds". (Tr. 537). His physical examination was normal except for contracture of both hands. (Tr. 538-39).

Plaintiff also underwent a consultative examination in February 2015 with Sushil M. Sethi, M.D., MPH. (Tr. 430-42). Dr. Sethi noted Plaintiff was "rather protective of what issue is preventing him from any work." (Tr. 430). After an examination, Dr. Sethi concluded Plaintiff's "ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying, and handling objects may be slightly affected." (Tr. 432).

At a March 2015 consultative psychological examination, the examiner's assistant observed localized partial seizures in Plaintiff's right arm. (Tr. 444). Plaintiff reported sleep difficulty, but could sleep six hours with Ambien. (Tr. 446). He reported his morning dose of medication makes him sleepy and that he would "sleep during the day quite a bit if [he is] not sleeping that well at night." *Id.* Plaintiff's mental status examination revealed grossly intact memory. (Tr. 448).

In April 2015, Plaintiff reported to Dr. Anouti that he "has 3 spells since last visit, one while waiting for SSI doctor, right hand started shaking, another time while pulling his teeth[,] and last time[] today while at his mother['s] house, he dropped pop from right hand". (Tr. 503). Plaintiff reported numbness, memory loss, and muscle twitching. *Id.* Dr. Anouti noted the "[l]ast

9

3 spells seem to be stress induced" and that Plaintiff was "stable on Keppra and Depakote". (Tr. 504). Dr. Anouti repeated his statement that Plaintiff could "drive at this stage to complete his chores" and could "work parttime [sic], no work at heights or with heavy machines or under extremes of temperature or stressful environment." *Id.*

VE Testimony

A VE testified at the administrative hearing. (Tr. 68-81). He was asked to consider a hypothetical individual limited in the manner ultimately found by the ALJ. (Tr. 72). The VE testified such an individual could perform work as a carwash attendant, storage facility rental clerk, and routing clerk. (Tr. 72-75). The individual could perform these jobs even if limited to superficial and occasional interactions with others. (Tr. 74). The VE testified that a person who was off-task for 10% of the day would be within the acceptable tolerance, but "above 10 to 12% up to 15% is only an accommodated work setting in an unskilled work environment would a work opportunity remain" based on his experience with the labor market. (Tr. 75).

ALJ Decision

In his August 13, 2015 decision, the ALJ found Plaintiff met the insured status requirements through December 31, 2017, and had not engaged in substantial gainful activity since his alleged onset date of April 22, 2012. (Tr. 17). He found Plaintiff suffered severe impairments of cervical spine degenerative disc disease, essential tremors, seizure disorder, depressive disorder, and anxiety disorder, but that these impairments—individually or in combination—did not meet or medically equal the severity of one of the listed impairments. (Tr. 17-18). The ALJ then concluded Plaintiff retained the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can only frequently climb ramps or stairs; and can never climb ladders, ropes, or scaffolds. [He] can frequently balance, stoop, kneel, crouch, or crawl. [He] can only frequently handle. He must avoid workplace hazards such as unprotected heights

10

and machinery, and cannot perform any commercial driving. [He] can perform no work with strict production quotas or fast-paced work such as an assembly line. He can perform only simple, routine, and repetitive tasks involving only simple work related decisions and with few workplace changes. [He] can frequently interact with the general public and coworkers. Lastly, he would be off task for 10% of the workday.

(Tr. 20-21). Based on the VE's testimony, the ALJ concluded Plaintiff was unable to perform past work, but there were other jobs existing in significant numbers in the national economy that he could perform. (Tr. 25-26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred in two ways: 1) in his evaluation of the opinion of treating physician Dr. Anouti; and 2) in his evaluation of Plaintiff's subjective symptom reports,

specifically regarding the side effects of his medication. The Commissioner responds that the ALJ did not err, and his decision is supported by substantial evidence.

Dr. Anouti's Opinion

Plaintiff first contends the ALJ failed to follow Social Security regulations in addressing Dr. Anouti's opinion that Plaintiff is limited to part-time work. Plaintiff argues the ALJ's analysis "lacks specificity" and does not provide the required "good reasons" for discounting a treating physician's opinion. (Doc. 14, at 14). Moreover, Plaintiff contends the ALJ erred in failing to identify Dr. Anouti as a treating physician. *Id.* at 15. The Commissioner responds that Dr. Anouti's statement about part-time work does not qualify as a "medical opinion" which the ALJ must address and give good reasons for discounting. (Doc. 16, at 14). And, the Commissioner contends, the ALJ properly rejected that opinion. *Id.* at 15. For the reasons discussed below, the undersigned finds no error.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if

13

the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). An ALJ's violation of the reasons-giving rule can be harmless error if: 1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; 2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the

14

claimant's ailments. *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (holding ALJ adequately addressed opinion by indirectly attacking both its consistency and supportability with other record evidence). "Thus the procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).

> The ALJ addressed Dr. Anouti's opinions:
>
> There are also notes in the record from Ahmad Anouti, M.D., stating that the claimant should be limited to part time work; with no work performed at heights, with heavy machinery, around extreme temperatures, or in stressful environments. I accord this opinion partial weight. The medical evidence of record does not support a restriction to part time employment. However, it does support restrictions to work at heights, around machinery, and at fast-paced and stressful production rates.

(Tr. 24). Because the ALJ *adopted* Dr. Anouti's specific functional restrictions regarding hazards and fast-paced work in the RFC, *see* Tr. 20-21, only his limitation to part-time work is at issue here. *See Wilson*, 378 F.3d at 547 (harmless error to fail to provide good reasons "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion").

First, a statement on an individual's ultimate ability to work is an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d); 416.927(d). And, an individual who is only able to perform part-time work is disabled under the regulations. *See Couch v. Comm'r of Soc. Sec.*, 2013 WL 5947174, at *3 (S.D. Ohio); *Pugh v. Astrue*, 2009 WL 1361922, at *4 (E.D. Tenn.); *Bladow v. Apfel*, 205 F.3d 356, 359 (8th Cir. 2000); *see also* SSR 96-8p, 1996 WL 374184, at *1 (the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental

activities in a work setting on a regular and continuing basis[,]" *i.e.*, for "8 hours a day, for 5 days a week, or an equivalent work schedule"). Thus, the ALJ did not err in declining to adopt Dr. Anouti's opinion that Plaintiff was limited to part-time work. *See Ellis v. Comm'r Soc. Sec.*, 2016 WL 1090373, at *8 (E.D. Mich). The Commissioner, not a treating source, is responsible for deciding whether a claimant meets "the statutory definition of disability:" 20 C.F.R. § 404.1527(d)(1). Although Plaintiff faults the ALJ's analysis of Dr. Anouti's restriction to part-time employment, the ALJ was not required to provide "good reasons" for rejecting this conclusion that Plaintiff was disabled. "While a treating source opinion regarding a claimant's *medical* condition is entitled to deference, the SSA 'will not give any special significance to the source of an opinion on issues reserved to the Commissioner.'" *Ellis*, 2016 WL 1090373, at *8 (quoting 20 C.F.R. § 404.1527(d)(3) (emphasis in original)). Thus, the regulations do not require the ALJ to defer in any way to Dr. Anouti's opinion that Plaintiff could only work part-time.[2] And, this is not a case where a treating physician's opinion was ignored. *See* SSR 96-5p, 1996 WL 374183, at *1, *3 ("opinions from any medical source on issues reserved to the Commissioner must never be ignored").

---

2. Plaintiff contends this is an improper post-hoc rationalization of the ALJ's decision. However, these regulations provide context for the type of opinion evidence to which an ALJ is, and is not, required to defer. The ALJ does not err in failing to provide good reasons for rejecting something that is not a "medical opinion". *See Olson v. Comm'r of Soc. Sec.*, 2015 WL 4254263, at * (W.D. Mich.) (holding that "[b]ecause [the physician] did not offer a medical opinion to which the ALJ was required to defer, the ALJ was not required to provide good reasons for discounting such" where the physician opined the claimant was "not really employable"); *see also Sebastian v. Astrue*, 2012 WL 4106046, at *4 (E.D. Ky.) (a treating physician's statements that a claimant could not sustain full-time work and would need to miss three days of work per month "are not medical opinions" and "are afforded no special significance") (citing 20 C.F.R. § 404.1527(d)). Additionally, for the reasons discussed below, the ALJ's decision here *did* provide the required reasons.

Second, even if this limitation is a "medical opinion", the ALJ's opinion, read as a whole, provides good reasons for the "partial weight" given to Dr. Anouti's opinion. In his opinion, the ALJ summarized the medical record, including many of Dr. Anouti's own records. *See* Tr. 22-24.[3] At each step of his analysis, the ALJ explained why that record did not support limitations beyond those the ALJ in the RFC. *See* Tr. 22 ("Again, this is an indication that the claimant is capable of performing a range of light work with postural, manipulative, and environmental limitations."); Tr. 22 ("As such, I find that this imaging, considered within the context of the entire record, does not support limitations beyond those outlined above.") (after reviewing MRI ordered by Dr. Anouti); Tr. 22 ("I find that these findings do indicate some objective imaging results consistent with a seizure disorder and recurrent tremors, but given the claimant's history of other objective signs, I do not find support for limiting the claimant more than described above.") (after reviewing May 2013 records from Dr. Anouti); Tr. 22 ("These are also signs that the claimant can perform a range of light work, consistent with the restrictions above.") (after reviewing August 2013 records from Dr. Anouti); Tr. 22 ("I find that this imaging demonstrates that the claimant's condition was chronic, but that it appeared to be relatively minor, and therefore is not inconsistent with performing a range of light work.") (after reviewing imaging ordered by Dr. Anouti); Tr. 23 ("This was an indication that this impairment does not prevent the claimant from performing a range of light work."); Tr. 23 ("I find that these examination findings are not consistent with restrictions

---

3. That the ALJ did not specifically identify the records he reviewed as Dr. Anouti's is not error. *See Al Ghawalb v. Comm'r of Soc. Sec.,* 2012 WL 2804837, at *7 (E.D. Mich) (citing *Monateri v. Comm'r of Soc. Sec.*, 436 F. App'x 434, 444 (6th Cir. 2011) (holding a failure to specifically mention a doctor by name does not constitute a lack of substantial evidence where that doctor's medical records and opinions were explicitly incorporated into the medical opinion of another doctor and were considered by the ALJ); *see also Pierce v. Comm'r of Soc. Sec.*, 2017 WL 1017440, at *1 (N.D. Ohio) ("[W]hile the ALJ did not refer to [the physician] by name, he did cite the doctor's treatment notes . . . It is apparent, moreover, that that LAJ relied on those records in concluding that [the claimant] was not disabled.").

17

beyond those outlined above."); Tr. 24 ("I accord these opinions [of state agency reviewing physicians] great weight as they are consistent with the record as a whole."); Tr. 24 ("This opinion is consistent with the record demonstrating that the claimant can perform light work, however."). Implicit in all of this analysis is the finding that Plaintiff can perform full time work. *See* SSR 96-8P, 1996 WL 374184, at *1 (stating that the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis[,]" *i.e.*, for "8 hours a day, for 5 days a week, or an equivalent work schedule").

The ALJ then, in reaching Dr. Anouti's opinion, gave that opinion "partial weight"— crediting his limitation regarding workplace hazards, and rejecting his opinion about part-time work. (Tr. 24). Plaintiff is correct that the reason given is conclusory: "The medical evidence of record does not support a restriction to part time employment." *Id.* However, the ALJ's statement is supported by the substantial evidence contained in the analysis leading up to the rejection of the opinion, in which the ALJ thoroughly explained why he found Plaintiff no more limited than described in his RFC, allowing for a limited range of light work. This evidence included: 1) Dr. Anouti's August 2013 note that Plaintiff had some relief from his tremors with medication, with normal strength and range of motion (Tr. 22) (citing Tr. 399); 2) Dr. Anouti's February 2015 note that Plaintiff was independent in his activities of daily living (Tr. 22-23) (citing Tr. 506); 3) results of examinations from multiple providers that Plaintiff's physical examinations were normal, *see* Tr. 22-23 (citing Tr. 331-32, 388-89, 399, 431-32); and 4) the ALJ's reasons for discounting Plaintiff's allegations of disabling medication side effects (Tr. 21-23).

Thus, the ALJ's rejection of Dr. Anouti's restriction to part-time work was supported by substantial evidence in the form of the ALJ's earlier discussion of both Dr. Anouti's, and other providers' records, and his explanation that those records supported his ultimate conclusion that

Plaintiff could perform light work. *See Nelson*, 195 F. App'x at 470 (indirectly attacking consistency and supportability of an opinion is sufficient to meet the goal of the reasons-giving requirement). "The fact that the ALJ did not analyze the medical evidence for a second time or refer to [his] previous analysis when rejecting [the physician's] opinion does not necessitate remand of Plaintiff's case." *Dailey v. Colvin*, 2014 WL 2743204, at *8 (N.D. Ohio) (citing *Nelson*, 195 F. App'x at 472). When read as a whole, as explained above, the ALJ's opinion provides reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544.

For these reasons, the undersigned recommends the Court find the ALJ did not err in his analysis of Dr. Anouti's opinion, and affirm the decision of the Commissioner.

<u>Subjective Symptom Analysis (Credibility)</u>

Plaintiff next contends remand is required because the ALJ erred in his analysis of Plaintiff's subjective symptoms reports. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed.

When making a credibility finding, the ALJ must make a finding based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1.[4] But, an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1.

---

4. This regulation as superseded by SSR 16-3p, 2016 WL 1119029. However, the effective date of the new regulation in March 2016 post-dates the ALJ's August 2015 decision in this case.

With regard to a claimant's subjective symptoms, the regulations require an ALJ to consider certain factors, including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR 404.1529(c) . . . describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements"). Although the ALJ must "consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *Roberts v. Astrue*, 2010 WL 2342492, at *11 (N.D. Ohio).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004). (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully supported, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

The ALJ summarized Plaintiff's testimony about his symptoms, including his allegations that his medication side effects prevent him from working:

> The claimant alleges that his physical and mental impairments cause him to be unable to perform work full time. The claimant stated that he stopped working after a motor vehicle accident. He testified at the hearing that around that time, he began having tremors up and down his arm, as well as the start of a tingling sensation. He stated that side effects from his various medications prevent him from working. He testified that he has fatigue, and has to lay around all afternoon. The claimant stated that his hands visibly shake, and also that he has anger issues that he takes medication for. He testified that he "zones out" six to eight times per day for three to four seconds. He also stated that he has issues with sleeping at night.

(Tr. 21). After so doing, the ALJ then explained:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. 21). In his analysis, the ALJ noted, *inter alia*:

> Dr. Sethi noted that the claimant was protective of what issue was preventing him from working, an indication that his allegations may not be fully supported by the record. (Exhibit 10F/1). The claimant's own testimony at the hearing further supports this, as he stated that if it were not for the side effects of his medication, he would be able to work. Yet, the record notes no side effects from medication in April 2015.

(Tr. 23).

Plaintiff objects, arguing:"[i]t is true that at this one visit, there were no 'side effects' listed, but by this time [Plaintiff] had treated with Dr. Anouti for two years and had reported on other occasions various side effects, as described above." (Doc. 14, at 19). Plaintiff then speculates that "[i]t is possible that Dr. Anouti was concerned only with side effects other than sedation." *Id.* at 19. While it certainly "is possible", it is also equally possible that Dr. Anouti noted no side effects in April 2015 because Plaintiff reported no side effects. And the Social Security standard of review requires this Court to affirm, even if substantial evidence or even a preponderance of the evidence

supports Plaintiff's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

And substantial evidence supports the ALJ's decision on this point. Although there are some notations of medication side effects in the record, *see* Tr. 388 (June 2013 report of sleepiness); Tr. 400 (August 2013 report of spaciness and short temper as medication side effects); Tr. 522 (March 2014 report of "S[o]me sedation, some moodiness."); Tr. 520 (June 2014 report of "[s]ome sedation, no other side effects"), there are also numerous reports of no side effects, or records where side effects are not noted, *see* Tr. 372 (May 2013 note of "no side effects"); Tr. 506 (February 2015 note of "no major side effects" and "[s]till independent in ADLs"); Tr. 503 (April 2015 note of "[n]o side effects").[5] Additionally, on numerous occasions, Plaintiff denied fatigue to medical providers. *See* Tr. 331 (March 2013); Tr. 344 (February 2013); Tr. 487 (August 2014); Tr. 499 (November 2014); Tr. 538 (February 2015). In June 2013, Plaintiff reported "issues with sleepiness and poor memory", (Tr. 388), but at his next appointment with Dr. Scherer, no fatigue was noted (Tr. 469-72).

And nowhere in Dr. Anouti's notes does he mention Plaintiff's medications cause fatigue. *See* Tr. 371-76, 399-400, 502-24. Although Plaintiff attempts to tie Dr. Anouti's statement that Plaintiff was limited to part-time work to his self-reported fatigue and need for daytime sleep, Dr. Anouti himself does not draw this connection. In fact, in the two treatment notes where Dr. Anouti

---

5. Moreover, Plaintiff's primary care physician, who primarily treated him for diabetes in the relevant time period, but also listed and was aware of Plaintiff's other medications, repeatedly noted no medication side effects. *See* Tr. 470 (September 2013 note that Plaintiff as "seeing [D]r. [A]nouti re seizures" and "tolerating meds"); Tr. 477 (February 2014 note that Plaintiff was "on Depakote 500mg bid and tolerating"); Tr. 498 (November 2014 note that Plaintiff was "tolerating meds"). Although it was not always clear to which medication Dr. Scherer is referring, it seems reasonable to assume that if Plaintiff were having allegedly debilitating side effects from his medication, that he would have mentioned it to his primary care physician.

opined Plaintiff is limited to part-time work, he lists no medication side effects. *See* Tr. 503-04 (noting Plaintiff is limited to part-time work, but also specifically noting "[n]o side effects" from Plaintiff's medications); Tr. 506-07 (noting Plaintiff is limited to part-time work, and also specifically noting "no major side effects" from Plaintiff's medications). Thus, the ALJ's failure to consider Dr. Anouti's limitation to part-time work as supporting Plaintiff's subjective reports of medication side effects was not error. *See Farhat v. Sec'y of Health & Hum. Servs.*, 1992 WL 174540, at *3 (6th Cir.) (Table) ("[A claimant's] allegations of the medication's side-effects must be supported by objective medical evidence."); *Smith v. Astrue*, 2012 WL 1232272, at *7 (N.D. Ohio) (finding ALJ did not err with regard to alleged medication side effects when claims of side effects were contradicted by the medical record); *Richesin v. Astrue*, 2010 WL 2594416 (E.D. Tenn) (testimony that Plaintiff was unable to drive due to medication causing drowsiness contradicted by Plaintiff's reports of no side effects to physicians).

Additionally, although Plaintiff seemingly contends it was error for the ALJ to only cite one treatment note, the ALJ's decision to cite only the April 2015 note was reasonable as it was the most recent treatment note available to the ALJ, and thus the most relevant to compare to Plaintiff's June 2015 testimony about medication side effects. *See* Tr. 503. This note thus had the greatest bearing on the credibility of Plaintiff's testimony. Moreover, the undersigned finds no merit in Plaintiff's argument that the ALJ somehow erred in not mentioning that Plaintiff "seemed to have dozed off in the middle of the hearing". (Doc. 14, at 19). The ALJ explicitly asked Plaintiff if he had fallen asleep, and Plaintiff denied doing so. (Tr. 74). There was, therefore, no reason for the ALJ to address this in his decision.

Further, the ALJ pointed to Dr. Sethi's statement that Plaintiff was "protective" of revealing what issue prevented him from working. (Tr. 23) (citing Tr. 430). This added further

support to his decision to partially discount Plaintiff's credibility as he has not consistently identified his medication side effects as disabling. *See Walters*, 127 F.3d at 531 (ALJ may discount claimant's credibility where ALJ find contradictions among the evidence and claimant's testimony).

Finally, the undersigned notes that the ALJ did credit Plaintiff's statements to some degree, as his RFC contains restrictions limiting him to "no work with strict production quotas or fast-paced work"; "only simple, routine, and repetitive tasks involving only simple work related decisions"; and that he could be "off task for 10% of the workday." (Tr. 21).

Thus, for the reasons stated above, the ALJ's decision to discount Plaintiff's allegation of disabling medication side effects is supported the ALJ's reasoning, and by substantial evidence in the record. It is the ALJ's duty, not this Court's to resolve conflicts in the evidence. *See Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007) ("When deciding under 42 U.S.C. § 405(g) whether substantial evidence supports the ALJ's decision, we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."). Although there certainly is evidence to support Plaintiff's claims, there is also substantial evidence to support the decision reached by the ALJ.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB supported by substantial evidence and recommends the decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).